UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  January 27, 2014
```

CESAR LOPEZ,                               :

                                          :

                  Petitioner,             :

                                          :    09 Civ. 1398 (PAC) (AJP)

        -against-                         :

                                          :    OPINION & ORDER

ROBERT ERCOLE, Superintendent,            :

Greenhaven Correctional Facility,         :

                                          :

                  Respondent.             :

-----------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

On December 2, 2002, Petitioner Cesar Lopez was convicted of murder in the second degree after a jury trial, conducted in New York State Supreme Court, Bronx County. He was sentenced to a term of 20 years to life.

Lopez stabbed his common law wife, Nilda Torres, eleven times after she had threatened to kill him. Ms. Torres was an alcoholic, who had been drinking for three days at the time of the incident. An autopsy revealed that she had .37 grams of alcohol in her blood (four times the legal limit), and that she also had cocaine in her blood, brain, and urine.

Lopez retained Manuel Ortega to represent him at trial.  At trial, Lopez argued that the killing was justified, forcing the People to prove beyond a reasonable doubt that the killing was not in self defense.  On appeal, Lopez's new lawyer argued that Lopez was denied the effective assistance of counsel for two reasons: (1) Ortega failed to adequately defend Lopez because he did not use the defense of extreme emotional disturbance ("EED")[1] at the time he murdered his common law wife; and (2) Ortega failed to object to the Judge's charge on the justification defense.

The Appellate Division rejected the arguments and affirmed the conviction.  After collateral proceedings pursuant to CPL § 440, Lopez commenced this habeas corpus proceeding.  On February 25, 2009, this Court referred the § 2254[2] Petition to Magistrate Judge Andrew J. Peck.  He conducted a hearing, and on April 21, 2010, Magistrate Judge Peck issued his Report and Recommendation ("R&R").  He found that Lopez was denied the effective assistance of counsel in violation of the Sixth Amendment right to counsel by Ortega's failure to raise the affirmative defense of EED.  Accordingly, he recommended that the Court grant the Petition and order the State to retry Lopez or resentence him for manslaughter.  (R&R 76).  The apparent

---

[1] New York Penal Law § 125.25(1)(a) provides for a partial affirmative defense to a charge of second degree murder when the "defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be."  Since this is an affirmative defense, defendant bears the burden of convincing the jury by a preponderance of evidence that (1) the defendant actually acted under the influence of EED; and (2) the explanation or excuse for this EED was reasonable.  People v. Roche, 98 N.Y. 2d 70, 75 (2002).  When the defense is successful in proving the EED defense, the result is not an acquittal, but instead a conviction for manslaughter.  This is different from the defense of justification (self defense) where the prosecutor bears the burden of proof beyond a reasonable doubt that the killing was not in self defense.  If the defense is successful on this theory, the result is an acquittal–not a manslaughter conviction.

[2] 28 U.S.C. § 2254(a) provides that "the Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

basis for the direction to resentence Lopez for manslaughter is the assumption that had the affirmative defense of EED been pursued, it would have been successful, resulting in a manslaughter conviction.  Magistrate Judge Peck recommended that the Court deny Lopez's second claim of ineffective assistance of counsel concerning the State Court judge's charge on justification.  Id. at 75.  The People filed objections to the R&R on June 22, 2010.  Lopez filed a response on July 23, 2010, and the People filed a reply on August 5, 2010.  The Court has reviewed the R&R and the parties' submissions.  For the reasons that follow, the Court denies habeas relief based on ineffective assistance of counsel.

## I.  <u>FACTS</u>[3]

On February 15, 2002, at approximately 10:25 p.m., Lopez killed his long-time common law wife, Nilda Torres ("Torres") in their Bronx apartment by stabbing her eleven times.  Thereafter, Lopez went to his neighbor's apartment, and asked them to call the police because his phone was broken.  Lopez returned to his apartment, but left his door open so the police could enter peacefully.  Lopez received his <u>Miranda</u> warnings; waived them; and when asked "What happened tonight?" confessed to the police.  Later the same evening Lopez confessed again a videotaped interview with the Bronx District Attorney.  On March 8, 2002, a Bronx grand jury indicted Lopez on two counts of second degree murder (intentional murder and depraved indifference murder).

---

[3] The facts are taken from the R&R, unless otherwise noted.  Transcript citations have been omitted.

### A.  Trial in New York Supreme Court, Bronx County

#### 1.    The Prosecution's Case

At trial, the prosecutor's case consisted primarily of Lopez's statements and admissions, as well as a report from the police and the Medical Examiner.  The evidence established that on February 15, 2002, at 10:30 p.m., police arrived at Lopez's apartment on Hoe Avenue in the Bronx.  Police found the door open and, upon entering, saw Lopez standing in front of Torres, who was dead on the couch, with multiple stab wounds.  The officers observed a bloody knife on the kitchen floor.  When directed to step outside the apartment, Lopez told the officers that he "could not take it anymore."  At approximately 10:45 p.m., he was arrested and brought to the 41st Precinct for questioning.

At the precinct, Lopez waived his <u>Miranda</u> rights.  When the investigating detectives asked "what happened tonight?"  Lopez responded:

> My wife, Nilda Torres, started drinking a lot since 1999 – vodka.  Tonight she started accusing me of having an affair with a woman on the second floor and [,] as usual, started to abuse me physically and verbally.

> This started at 6 p.m. tonight.  She is mentally sick and when she drinks.  She gets much worse.  Tonight I was in bed watching TV and she came into the bedroom holding a knife in her right hand.

> She says you keep fucking with that woman, I will kill you.  I told her to try . . . and kill me when I am asleep or I will take that knife and stab you in the belly.

> She then came at me with [the] knife and I was able to take the knife away and stab her six times.  I then go to my next door neighbor and tell her I stabbed my wife [and] call the police.  I put a ten inch knife with duct tape on [the] handle on the kitchen sink.  This is the knife I used to stab Nilda.

At 4:10 a.m., an Assistant District Attorney ("ADA") questioned Lopez on videotape, which was played for the jury at trial.  Lopez stated that he was sixty-six years old and worked as the superintendent of the building where he and Torres had lived for four years.  They had lived together for a total of sixteen years and, over the past few years, Torres's drinking problem had worsened.  Lopez said that Torres once told him that she did not care if she dropped dead from drinking the next day, to which he responded that he wished she would drop dead that day.  Lopez also told the ADA that Torres had stabbed him on several occasions and revealed stab wounds on his arm, hand, stomach, and torso.  At the time, there was a criminal case pending against Torres for allegedly stabbing Lopez in the hand.  Lopez stated that Torres was "mentally disturbed" and that he had tried to sleep in a separate room from her, which he claims she would not allow.  He was unable to fall asleep in the same bedroom with her for fear that she would attack him.  He stated, however, that he was capable of defending himself unless she stabbed him in the back, and that he was not afraid Torres would kill him.  He further commented that he was "an idiot" and should "have walked away from [Torres] a long time ago."

Lopez told the ADA on the videotape that, on February 15, 2002 at approximately 6:00 p.m., he and Torres began fighting when she accused him of having an affair with a woman in their building.  She had been making this accusation since 1999, and he told her to leave him alone because he did not want any more problems.  She continued to yell at him, until around 10:00 p.m., when she entered the bedroom with a 10 inch kitchen knife.  Lopez told Torres, "you better go back to the living room because if you attempt anything with that knife, and you don't kill me, I'm going to take the knife away from you and I am going to kill you because I'm fed up with it because you have been abusing . . . me like that."  Torres lunged at Lopez, who sustained a wound as he deflected the knife with the palm of his hand.  He stated that she made him "so

angry when she did that" that he slapped her in the face, took the knife away from her, and told her to go to the living room and leave him alone.  At this point, Lopez stated, Torres was "so drunk, she wouldn't even walk."

According to Lopez's videotaped statement, Torres went to the living room, where she continued to yell at Lopez.  He stated that she made him "so angry" that he "couldn't take it anymore," went into the living room, and stabbed her five or six times.  He said he was "tired of being abused," "just can't take it no more," and was fed up with the law because a "woman can kill a man and she get[s] away with murder" but if "a man touch[es] a woman, he's in trouble." Lopez concluded as follows:

> What I did, I did it, and that's it. . . .  I got to face the fact that I did it, and if I'm guilty, I'm guilty. . . .  I've been very frank. . . .  I've been very helpful, I think, you know, by telling you the truth, you know. . . .  I'm not saying I don't know why I did it. . . .  I did it because I'm fed up with it.  I can't take it no more.  You know, you push me today, you push me tomorrow, and you push me the following day, be careful because sooner or later, I'm going to get angry and if I get angry, you're going to be in trouble, you see. . . . That's the person I am.  That – that's it.  That's the story of my life.

Dr. Margaret Prial of the Office of the Chief Medical Examiner performed Torres's autopsy.  Torres suffered eleven stab wounds, including wounds to her head, face, neck, torso, and left arm, ranging from one-quarter of an inch to eight inches in depth.  The fatal wounds were the "stab wounds of torso with penetration of heart and perforation of duodenum and mesentery."  Torres also had bruises on her scalp and left arm.  Dr. Prial testified that the wound on her left arm was consistent with an effort at self-defense.  The toxicology report indicated that Torres, who was approximately 5'9" tall and 180 pounds, had .37 grams of alcohol in her blood and urine, as well as cocaine in her blood, brain, and urine.

At the close of the People's case, Lopez moved to dismiss on the ground that the prosecution had not "established a prima facie case."  Justice Newman denied the motion.

## 2.  Lopez's Trial Testimony

Lopez took the stand in his defense and testified that he felt threatened by Torres' behavior.  He elaborated on earlier incidents with Torres involving threats and attacks.  On November 21, 2001, Torres attacked Lopez with a knife and cut his hand.  After her arrest on his complaint, a protective order issued against her, barring her from being near Lopez if she "committed any disturbances."  Although Lopez initially told Torres's lawyer that he did not want her to live with him anymore, he allowed her to stay when she returned shortly thereafter. Following her return, she continued to threaten and attack Lopez (including an incident a week before the fatal night), causing Lopez to call the police "many times" to report violations of the protective order, but not on the night of the killing because his phone was out of order.

On February 15, 2002, Torres was in the midst of a three-day drinking binge.  When Torres drank, she became belligerent; and on this occasion she threatened him, saying that Lopez was "not going to live past today because [he was] fucking with that whore from the second floor."[4]  As a result, Lopez was only able to sleep for a few hours each of the three previous nights.  Lopez went to work at 9:00 a.m. the day of the killing and picked up his pay on the way home.  Around 3:30 p.m., he laid down in the bedroom while Torres continued drinking.  While he was laying down, Torres began "fighting alone," threatening that she would kill Lopez and that "[t]onight [was going to be [his] night."  At approximately 9:30 p.m., she entered Lopez's

---

[4]   Torres had often accused Lopez of having an affair with a woman in their building, an allegation Lopez repeatedly denied.

bedroom with a knife in her hand, telling him, "[w]ake up son of a bitch, I'm going to kill you." He complied with her direction to stand and responded "Nilda, please, do not start with your nonsense." Torres lunged at Lopez with the knife, saying she was going to kill him, and stabbed his right hand five times. He hit her in the face and took the knife away from her.

Lopez then went into the living room, holding the knife, and Torres followed. He sat on the sofa and told her to stop fighting with him, telling her "Nilda, please do not continue with this nonsense," and that he "didn't want any more problems from the ones [they] already had." Lopez also reminded her about plans to celebrate Valentine's Day. Torres responded: "go celebrate with the whore from the second floor because from tonight on you're not going to live because I'm going to kill you." When he stood up, Torres told him, "[y]ou're a sucker, you don't have any strength, not even to kill a fly." At that point, Lopez "lost [his] mind"[5] and stabbed her. He only remembered stabbing her six times. At the time, his "head was not in its place. It was not" him, and he "did not want to kill her." Lopez also testified that, unlike previous occasions when Torres threatened him, this time he could not convince her to drop the knife. Lopez thought that "definitely that on this evening she was going to kill" him. He believed that "if [he] did not kill her on this day she was going to kill" him. Lopez testified that unlike the previous occasions when Torres had threatened him, this night was different because "other times [when] she had threatened [him] with a knife in [her] hand, [he] would convince her, by speaking to her, to drop the knife to the floor, that [he] did not want to hurt her." Lopez testified that on this occasion, she would not relinquish the knife, and he thought that [d]efinitely

---

[5] On cross-examination, Lopez stated that he "lost [his] patience."

[] on this evening she was going to kill [him.]"  Lopez testified that he believed that "if [he] did not kill her on this day she was going to kill" him.

After stabbing Torres, Lopez entered the kitchen and dropped the knife.  He went next door to his neighbor's apartment and told her to call the police because "[he has] wounded Nilda, and [does] not know if she's dead."  He returned to his apartment to wait for the police, leaving the door open so they could enter safely.  He knew that "when it has to do with these type of cases, the police come to knock on the door with their pistols in their hands.  And the way [he] had [his] head at the moment, if that would have happened, it would have been another tragedy."

Lopez also testified that his chronic asthma causes "mental confusion," and that, when he has "bad moments," his high blood pressure makes breathing difficult.  When he was placed in the police car, Lopez "wasn't feeling well [and his] head was bad because it had been two days, three days, that [he] hadn't been able to sleep."  At the precinct, he did not have his glasses or asthma inhaler.  He was feeling "very bad."  His "head was not in the right place" and he "just wanted to leave there as soon as possible."  As a result, he responded affirmatively to all of the officers' questions and was unable to read the statement before signing it.

Lopez explained that during the videotaped confession, his "mind was not in the right place," he was half-asleep, and he said "the first thing that came to mind. . . .  [He] said what happened that night but not in the proper manner that [he] was supposed to."  He stated that he was not the same person as in the videotape because that man was "pissed off" at Torres for fighting with him: "I'm not that kind of person.  The person that was giving those statements there was a nut.  It was not me."  Eight months later, at the trial in October, his mind was clear and the events leading to the murder had been "playing and playing" in his mind while in jail

awaiting trial.  He concluded that "the reason why [he] killed [his] wife was because at the moment that she started lunging at [him] with the knife [he] lost it."

Lopez did not contend that he was experiencing extreme emotional disturbance at the time of the killing.  He offered no evidence in support of the affirmative defense of extreme emotional disturbance.  At the end of the defense's case, trial counsel renewed his motion to dismiss, and Justice Newman denied the motion.

### 3.  Summations

Lopez's lawyer, Ortega, argued that Lopez killed Torres in self-defense, out of fear that she was going to kill him.  Torres's death was justified because Lopez had to do something before she killed him; he was in legitimate fear for his safety.  Ortega argued that Lopez was in shock, upset, sleep-deprived, and having trouble breathing when he made his written and videotaped confessions, causing him to give incomplete or inaccurate answers to the leading questions.  Now that his mind was clear, Lopez testified truthfully that he defended himself in response to the reasonable fear that Torres was going to kill him.

The People argued Lopez simply lost his patience and murdered Torres.  According to the prosecutor, the number and depth of the stab wounds evidenced Lopez's intent to kill.  Lopez's videotaped confession showed him to be fully awake, competent, and breathing freely.  The only disparities between Lopez's trial testimony and his confession were whether Lopez thought Torres could kill him and whether she followed him, or vice versa, from the bedroom into the living room.  The People urged that both details were fabricated to bolster the claim of self-defense.  Lopez was the aggressor when he went into the living room and stabbed Torres

eleven times, and considering that Torres was completely drunk and had already been disarmed, she could not have posed an imminent danger to Lopez when he killed her.

### 4.  Charge Conference and Jury Charge

At the charging conference, Ortega asked the court to include second degree manslaughter as a lesser included offense of the intentional and depraved indifference murder counts.  The Court denied the request, but included a charge on first degree manslaughter, as a lesser included offense to the charge of intentional murder.  The Court granted defense counsel's request to give a justification charge, ruling that it would instruct that "each stab wound has to be justified."  Lopez's counsel did not object to this language nor did he request a charge on the affirmative defense of EED.

On October 30, 2002, the Court submitted three counts to the jury: second degree murder (intentional and depraved indifference) and first degree manslaughter.  With respect to justification, the Court charged the jury as follows:

> The People must establish beyond a reasonable doubt that . . . in the encounter in the living room, the defendant was the initial aggressor, that is, the first person to use offensive deadly physical force. . . .  If you find that the defendant was the first person to use deadly physical force, then you do not consider self-defense and ignore the rest of my charge on justification.
>
> . . .
>
> The first question you must determine in deciding whether the defendant was legally justified in using deadly physical force in the defense of his person, is whether the defendant reasonably believed that Ms. Torres was using, or was about to use[,] deadly physical force against him.
>
> . . .

11

The second question you must consider in evaluating whether the defendant was justified in using deadly physical force is whether he reasonably believed that his use of deadly physical force was necessary to prevent the attack which he reasonably perceived.

. . .

[A]s you apply this justification evaluation, you have to apply it to every single stab wound that the defendant inflicted because a defendant must have to be justified in each and every stab wound separately.

. . .

If at some point . . . the defendant continued to use deadly force at a time when it was no longer reasonable to believe that the use of deadly physical force was necessary to defend himself, then you must conclude that at that point he was no longer acting in self-defense.

The court also instructed the jury that it could consider the couple's violent history in determining whether Lopez believed danger was imminent. Defense counsel's only objection to the jury charge was Judge Newman's decision not to submit second degree manslaughter as a lesser included offense.

### 5. Verdict and Sentence

On October 30, 2002, the jury convicted Lopez of second degree murder (intentional). On December 2, 2002, the Court sentenced Lopez to twenty years to life imprisonment.

### B. Appeal to Appellate Division, First Department

On appeal, the Legal Aid Society represented Lopez. Appellate counsel argued that (1) trial counsel was ineffective for failing to pursue an EED defense or object to the "grossly unfair and incorrect justification charge"; and (2) the sentence of twenty years to life was excessive. On January 9, 2007, the First Department unanimously affirmed the conviction. People v.

Lopez, 36 A.D.3d 431 (1st Dep't 2007).  The court held that whether Defendant's claim that his

counsel provided ineffective assistance by failing to raise an extreme emotional disturbance

defense and request a jury instruction thereon (See Penal Law 125.25[1][a]) is

> unreviewable on direct appeal because it involves matters outside the record
> concerning strategic choices, which counsel has had no opportunity to explain
> (citations omitted).  On the existing record, to the extent it permits review, we
> find that defendants received effective assistance under the state and federal
> standards.  People v. Benevento, 91 N.Y.2d 708, 713-4 (1998).  See also
> Strickland v. Washington, 466 U.S. 668 (1984).
>
> Defendants' version of events more closely supported a justification defense,
> which counsel vigorously pursued[6], than the defense of extreme emotional
> disturbance.  See People v. Cutting, 210 A.D.2d 791 (1984) lv. Denied 85 N.Y.2d
> 971 (1985).  Moreover, as extreme emotional disturbance defense, upon which a
> defendant bears the burden of proof would have been weak at best under the facts
> presented, and there does not appear to have been a reasonable view of the
> evidence that would have obligated the Court to instruct the jury on that defense.
> See People v. Walker, 64 N.Y.2d 741 (1984).  Counsel could have reasonably
> concluded that an extreme emotional disturbance defense would have confused
> the jury and detracted from the justification defense.  Counsel should also have
> reasonably concluded that extreme emotional disturbance, a mitigating defense,
> would have reduced defendant's chance for a complete acquittal.  In any event,
> were we to find that counsel should have employed this defense, we would find
> that his failure to do so did not cause any prejudice to defendant.  People v.
> Caban, 5 N.Y.3d 143, 155-156 (2005).

The First Department also rejected Lopez's argument as to the justification instruction on

the grounds that the failure to provide a broader instruction regarding who was the initial

aggressor was harmless error, and that the remainder of the charge was legally accurate.  Finally,

the court found no basis for reducing the sentence.  In sum, the Appellate Division held that

Lopez had received effective assistance of counsel under state and federal standards with respect

---

[6] Ortega gave opening and closing statements, thoroughly cross-examined the prosecution's witnesses, objected to three items of evidence, moved for an order of dismissal at the close of the prosecution's case, and successfully convinced Justice Newman to charge justification, as to which the Government had the burden of proof; and to include a charge on the lesser included offense of manslaughter in the first degree.

to the two arguments raised on appeal: failure to raise the defense of extreme emotional disturbance; and failure to object to the jury charge on justification.

On April 10, 2007, the New York Court of Appeals denied Lopez's leave to appeal. People v. Lopez, 8 N.Y.3d 947 (N.Y. 2007).

### C.  Section 440.10 Motion to Vacate Before New York Supreme Court, Bronx County

On June 27, 2008, Lopez filed a N.Y. CPL § 440.10[7] petition to vacate the judgment of conviction.

### 1.  Lopez's Argument in the 440.10 Proceeding

Lopez's counsel renewed the arguments made on appeal that trial counsel was ineffective for failure (i) to pursue the affirmative defense of EED; and (ii) to object to the court's unbalanced and unfair jury instructions on justification.  Lopez's § 440 counsel said he tried to get an explanation from trial counsel, concerning his failure to raise the affirmative defense of EED; but he did not respond.  § 440 counsel said that appellate counsel, Jeffrey Richman, had spoken with trial counsel in 2006.  According to Richman, trial counsel reportedly said that he did not pursue the affirmative defense of EED because Lopez "was a 'proud Hispanic man' and he 'couldn't go that route' without Mr. Lopez's help and the aid of a psychiatrist or psychologist."

---

[7] CPL § 440.10 provides the statutory framework for collateral attacks on judgments of conviction.

14

Lopez's affidavit claimed that trial counsel told him that their defense would be self defense, and that they would win at trial.  Trial counsel never discussed the prospect of having Lopez evaluated by a psychiatrist or psychologist.  Lopez asserted that he was not in a good mental state at trial, nevertheless, he realized that trial counsel was failing to put forth effective arguments on his behalf.  Finally, Lopez offered a new argument: had he been offered a chance to plead guilty to manslaughter for a lesser sentence, he would have taken that opportunity.

## 2.  The Prosecution's Argument in the 440.10 Proceeding

ADA Wang submitted an affidavit setting forth her conversation with trial counsel. According to Wang, trial counsel believed that the relevant events "more readily comported with a justification defense than the defense of extreme emotional disturbance."  Trial counsel is also quoted as discussing both the justification and extreme emotional disturbance defenses with Lopez, resulting in Lopez's "agreement to pursue the justification defense."  With respect to Lopez's willingness to enter a manslaughter plea, the District Attorney said that trial counsel sought such a plea, but the prosecutor refused.  Trial counsel denied ever telling Lopez's appellate counsel that he rejected the extreme emotional disturbance defense in part because Lopez was a "proud Hispanic man."  ADA Wang testified that trial counsel was aware that testimony from a psychiatrist or psychologist was not necessary to argue extreme emotional disturbance.

In addition to this factual submission, the Assistant District Attorney argued that Lopez's ineffective assistance of counsel claim was procedurally barred under C.P.L. § 440.10(2)(a)[8]

---

[8] CPL § 440.10(2)(a) provides that "the court must deny a motion to vacate a judgment when . . . [t]he ground or issue raised upon the motion *was previously determined on the merits upon an appeal from the judgment*, unless

because it was already decided on the merits on direct appeal, and in any case, the claims were unsubstantiated.[9]

### 3.  Decision on the § 440 Motion

Judge Newman rejected Lopez's § 440 motion, holding that the claim of ineffective assistance of counsel issue had been "determined on the merits" by the Appellate Division. Accordingly, Lopez was precluded from raising the same issue anew on his 440.10 motion. Judge Newman determined that since the Appellate Division found that "[o]n the existing record, to the extent it permits review, we find that defendant received effective assistance under the state and federal standards," Lopez's claim had been considered on the merits.

Even if the Appellate Division's decision on the affirmative defense of extreme emotional disturbance did not constitute a determination on the merits because that issue involved matters dehors the record, "Lopez's motion is summarily denied pursuant to C.P.L. § 440.30(4)(b) because he did not satisfy his burden of proving the 'absence of strategic or other legitimate explanations for counsel's alleged shortcomings. . . . through facts which existed or occurred outside the record.'"  Judge Newman noted that, as was the case in the Appellate Division, the court's review of Lopez's 440.10 motion was limited to the facts on the record.

_____

since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue." (emphasis added).

[9] The State alleged that the § 440.10 motion was unsubstantiated because Lopez failed to obtain an affidavit from trial counsel regarding why he failed to raise an EED defense.  The Defense claimed that they had attempted to procure an affidavit, but trial counsel had not responded to their inquiry.  The State also noted that trial counsel provided Lopez a vigorous defense: Mr. Ortega gave opening and closing statements, thoroughly cross-examined all the prosecution's witnesses, objected to three items of evidence, moved for an order of dismissal at the close of the prosecution case, and successfully convinced Justice Newman to charge the defense of justification and the lesser included offense of first degree manslaughter.

Given that Lopez failed to include "sworn allegations substantiating or tending to substantiate all the essential facts [for example, including an affidavit by trial counsel attesting to his alleged ignorance of the availability of the EED defense without psychiatric testimony]" the 440.10 motion must be denied.  C.P.L. § 440.30(4)(b).

### 4.   Magistrate Judge Peck's Recommendation

Magistrate Judge Peck recognized that the denial of a § 440 motion on procedural grounds is normally an adequate and independent state ground.[10]  The First Department held that the ineffective assistance claim was "unreviewable on direct appeal because it involves matters outside the record."  (R&R 37).  Magistrate Judge Peck reviewed the Second Circuit cases regarding whether denial of a motion pursuant to C.P.L. § 440.30(4)(b) is an "independent and adequate" state procedural bar to habeas review.[11]  He found that, in this case, the denial of a

---

[10]  Procedural default is a "judicially created doctrine that bars federal claims that were not raised in state court as required by state law.  In order for procedural default to apply, the state court's rulings must be based on an adequate and independent state law ground rather than on federal law.  Federal courts presume the absence of an independent and adequate state ground for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law."  Presiding Over a Capital Case, Ch. 10, "Federal Habeas Corpus, Prof. Penny J. White § 10.15 (p. 303-) (citing Harris v. Reed, 489 U.S. 255, 266 (1989).

[11]  For cases that find that denial of a motion pursuant to C.P.L. § 440.30(4)(b) is an "independent and adequate" state procedural bar to habeas review, see e.g, Williams v. McGinnis, No. 04-cv-1005, 2006 WL 1317041 at*10 (E.D.N.Y. May 15, 2006) (state court relied on a procedural default rule in denying the petitioner's motion to vacate based on § 440.30(4)(b)); Marsh v. Ricks, 02-cv-3449, 2003 WL 145564 at *6-7 & n.7 (S.D.N.Y. Jan. 17, 2003) ("[B]ecause the denial of a motion to vacate a conviction pursuant to [C.P.L.] § 440.30(4) constitutes reliance on an independent and adequate state law ground, our review of petitioner's claim is barred by this procedural default absent a showing of a valid excuse.") (citing Roberts v. Scully, 875 F. Supp. 182, 193 n.7 (S.D.N.Y.), aff'd, 71 F.3d 406 (2d Cir. 1995)); Ahmed v. Portuondo, No. 99-cv-5093, 2002 WL 1765584 at *1-2 (E.D.N.Y. July 26, 2002) (Where "trial court, on the CPL § 440 motion, . . . relied on the adequate and independent state ground that petitioner failed to support [his] claim with any evidence or sworn affidavits beyond his own," citing C.P.L. § 440.30(4)(d), petitioner's habeas claim "is subject to a procedural bar.  For cases that find that denial of a motion pursuant to C.P.L. § 440.30(4)(d) is a decision on the merits and does not constitute a procedural bar to a federal habeas claim, see Skinner v. Duncan, 01-cv-6656, 2003 WL 21386032 at *28 (S.D.N.Y. June 17, 2001) (Peck, M.J.) report & rec. adopted, 2005 WL 1633730 (S.D.N.Y. July 11, 2003) (denial of a motion pursuant to C.P.L § 440.30(4)(d) does not constitute a procedural bar to a federal habeas claim); Garcia v. Portundo, 104 Fed. Appx. 776, 779 (2d Cir. 2004) ("Even aside from the fact that [C.P.L. § 440.30(4)] opens with an explicit reference to 'considering the merits of the motion,' subsection (c) implicitly requires a balancing of the evidence presented by the parties. . .").

motion pursuant to C.P.L. § 440.30(4)(b) constitutes a decision on the merits.  Id. at 42-43.

"Specifically, the Court agrees with the reasoning of Judge Gleeson's decision in Lou v. Matello,

No. 98-cv-5542, 2001 WL 1152817 43 at *9 n.9, that because C.P.L. § 440.30 refers to the

procedures for deciding C.P.L. § 440 motions, and C.P.L. § 440.30(4) specifically states that

upon considering the merits of the motion, the court may deny it without conducting a hearing if

certain conditions exist, that is a merits based decision, not a procedural bar.

### 5.  For the Purpose of Lopez's § 440.10 Motion, the Appellate Division's Decision of January 9, 2007 Determined Lopez's Ineffective Assistance Claim on the Merits

Justice Newman held that, for the purpose of Lopez's § 440.10 motion, the Appellate

Division determined Lopez's ineffective assistance claim on the merits.  The Appellate Division

held that the ineffective assistance claim was barred as "unreviewable on direct appeal because it

involves matters outside the record"; but continued "on the existing record, to the extent that it

permits review, we find that defendant received effective assistance under state and federal

standards . . . [I]n any event, were we to find that counsel should have employed this defense, we

would find that his failure to do so did not cause any prejudice to defendant."  People v. Lopez,

36 A.D.3d at 432.  (See full text at pg 13, supra.).

These holdings are a determination of Lopez's ineffective assistance of counsel claim on

the merits.  See People v. Alexander, 6 Misc.3d 1026(A) (N.Y. Sup. Ct. 2005) citing Jones v.

Miller, No. 03-cv-6993SHSGWG, 2004 WL 1416589 at *9 (S.D.NY) (appellate court's decision

addressing defendant-appellant's claim in an "alternative holding" constituted a determination on

the merits).

The Court finds that Judge Newman's denial of Lopez's motion to vacate was a determination on the merits. As such, the AEDPA standard of review applies.

### D. Habeas Corpus and Federal Hearing

Magistrate Judge Peck directed Mr. Ortega, Lopez's trial counsel, to submit an affidavit explaining why he did not pursue the affirmative defense of extreme emotional disturbance. Mr. Ortega complied. The Magistrate Judge also received affidavits from Lopez's appellate counsel and Lopez's sister. Based on the affidavits, Magistrate Judge Peck conducted a hearing. Mr. Ortega testified, as did Dr. Sanford Drob, an expert in forensic psychology. Dr. Drob could not determine whether Lopez suffered from extreme emotional disturbance at the time of the killing; but, nonetheless, he would have recommended pursuing the defense, had he been consulted in 2002.

Magistrate Judge Peck determined that Lopez had not received effective assistance of counsel because Mr. Ortega failed to pursue the affirmative defense of EED, and that the New York courts had unreasonably applied Strickland v. Washington in determining that the failure to raise this affirmative defense did not constitute ineffective assistance of counsel. The Magistrate Judge concluded that Mr. Ortega's choice of a justification defense was a poor strategic option which highlighted his ineffectiveness in not pursuing EED as an affirmative defense. But Magistrate Judge Peck found that trial counsel was not ineffective for failure to object to the justification charge. While the charge highlighted that there was no real defense, the charge was correct as a matter of law.

Magistrate Judge Peck recommended granting the writ of habeas corpus and that Lopez either be retried or resentenced for manslaughter (the crime for which he would have been

convicted had he established by a preponderance of the evidence that he was experiencing EED

when he killed his common law wife by stabbing her eleven times).

      If Lopez had successfully established by a preponderance of the evidence the affirmative

defense of extreme emotional disturbance, he would be guilty of manslaughter in the first degree,

a Class B felony.  New York Penal Law § 125.20(2).  The sentencing range for a Class B felony

is 9 years to 25 years.  New York Penal Law § 70.

## II.   § 2254, AS MODIFIED BY THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 ("AEDPA")

      Under the AEDPA, the United States Supreme Court has repeatedly held that habeas

corpus relief is not available, if the State court's decision denying relief is reasonable.

Reasonable does not mean the State court is or has to be correct.  It does not mean that the

habeas court has a better or more insightful view on the appropriate outcome.  Even a strong case

for relief does not mean that the State's contrary conclusion is unreasonable.  In determining

what is reasonable the habeas court must be deferential to the State court's determination; and

where the claim is one of inefficient assistance of counsel, the habeas court's review must be

doubly deferential.

### A.  AEDPA Standard of Review of State Court Decisions

      The habeas corpus statute, as amended by AEDPA, provides:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d)(1), (2).  "By its terms § 2254(d) bars re-litigation of any claim 'adjudicated on the merits' in state court unless the issue falls within the two limited exceptions."  Harrington v. Richter, 131 S.Ct. 770, 784 (2011).  The Petitioner has the burden of demonstrating the state court's objectively unreasonable application of clearly established federal law.  See Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009) (citing Waddington v. Saurasad, 555 U.S. 179, 190 (2009)).  "Clearly established federal law" means definitive holding by the Supreme Court, not Circuit Court or District Court decisions, and certainly not dicta.  Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).

Supreme Court jurisprudence interprets the statutory requirement to be highly deferential to "state courts in § 2254(d) habeas cases."  Cavazos v. Smith, 132 S.Ct. 2, 5 (2011); see also Renico v. Lett, 130 S.Ct. 1855, 1858 (2010) ("The [] AEDPA imposes a highly deferential standard for evaluating state-court rulings . . . [and] demands that state-court decisions be given the benefit of the doubt."); see also Hardy v. Cross, 132 S.Ct. 490, 495 (2011) which raised an issue under the Confrontation Clause as to whether the prior sworn testimony could be used when a witness was "unavailable" ("the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken.  Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed."); Richter, 131 S.Ct. at 786-87 (a petitioner must show that the state courts' ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.").  As amended, § 2254 prevents "defendants—and

federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." <u>Renico</u>, 130 S.Ct. at 1866.  This emphasis on deference to state courts "is compelled by 'the broader context of the statute as a whole,' which demonstrates Congress' intent to channel prisoners' claims first to state courts.'" <u>Cullen,</u> 131 S.Ct. 1388 at 1392 (quoting <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341 (1997)).

Deference to state courts applies, as well, to the taking of evidence in federal habeas proceedings.  § 2254(d)(1) review is "limited to the record that was before the state court that adjudicated the claim on the merits."  <u>Cullen v. Pinholster</u>, 131 S.Ct. at 1398 (holding that habeas review in federal court "requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.") <u>see</u> <u>also</u> <u>Cordova Diaz-Brown v. Brown</u>, No 10-cv-5133, 2011 WL 5121097 at *2 (S.D.N.Y. Oct. 28, 2011) (holding that where petitioner's "exhibits do not form part of the record before the state court . . . [the exhibits] cannot be considered on his federal habeas petition.").

**B.    § 2254 Review is Limited to the Record that was before the State Court, and May Not Include Additional Fact-Finding**

<u>Cullen v. Pinholster</u>, <u>supra</u>, addressed the question of whether defense counsel had rendered effective assistance in the penalty phase of a murder trial.  At the penalty phase, counsel chose not to call a psychiatrist and instead called only the defendant's mother to demonstrate mitigation.  The jury recommended the death penalty.  The defendant claimed that counsel was ineffective for failing to adequately investigate and present mitigating evidence during the penalty phase.  Such evidence included various school, medical and legal records, family statements, and a different psychiatrist who diagnosed a bipolar mood disorder, as opposed to the

22

original psychiatrist who said that defendant had only an antisocial personality disorder.  The California Supreme Court denied defendant's ineffective assistance claim.  The District Court, however, held a hearing, heard the same evidence, and based on its consideration of this evidence, granted the habeas corpus petition.  The Ninth Circuit affirmed, holding that the California Supreme Court decision involved an unreasonable application of clearly established federal law.

The Supreme Court reversed, holding that 2254 review is limited to the record before the State court which adjudicated the claim on the merits.  AEDPA limits the power to grant a habeas writ; and specifies the standard to be used.[12]  This standard is "difficult to meet . . . because it was meant to be," and is a "highly deferential standard for evaluating State court rulings, which demands that State court decisions be given the benefit of the doubt."  See Richter, 131 S.Ct. at 786; Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (quoting Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997)).  The petitioner carries the burden of proof.  Woodford, 537 U.S. at 25.  Furthermore, the Cullen court held that, since § 2254(b) requires that state prisoners ordinarily exhaust their state remedies before seeking federal relief, "[i]t would be contrary to that purpose to allow a petitioner to overcome an adverse State court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo."  131 S.Ct. at 1399.  Cullen holds that "evidence introduced in federal court has no bearing on § 2254(d)(1) review.  If a claim has been adjudicated on the merits by a State

---

[12] A § 2254 petition must first exhaust state remedies before seeking federal relief.  If there has been an adjudication on the merits, the writ may not be granted unless the petition demonstrates that the State adjudication: (1) resulted in a decision that was contrary to or involved in unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; and (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Id. at 1400.

Under the Supreme Court's teachings and holdings, it is the state court record which must be reviewed for error within the scope of § 2254(d), not the new record created in federal court. Indeed, no federal hearing is required. This Court looks to evaluate whether or not the state court—considering only the record before the state court—engaged in an "unreasonable" application of federal law under § 2254, as amended by the AEDPA. There is a clear distinction between being "incorrect" and being "unreasonable." "The question under AEDPA is whether the [state court's] determination was 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), not whether it was an incorrect application of that law." Renico v. Lett, 130 S.Ct. 1855, 1862 (citing Williams v. Taylor, 259 U.S. 362, 410 (2000)). The Supreme Court has found that the latter provides a "substantially higher threshold" for granting a writ of habeas corpus. Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009) quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

The Second Circuit recognizes the impact on its habeas jurisprudence by the Supreme Court's decisions in Renico and Cavazos: "the AEDPA's standard was meant to be difficult." Byrd v. Evans, 420 Fed.Appx. 28, 30 (2d Cir. Mar. 21, 2011). In Rivera v. Cuomo, the Second Circuit, on rehearing, reversed its prior decision to grant a writ of habeas corpus[13] "in light of the Supreme Court's guidance in Cavazos." 664 F.3d 20 (2d Cir. Dec. 16, 2011). The Rivera court reasoned that although evidence of "significantly heightened recklessness" was "slim, at best,"

---

[13] This decision was based on the determination that the state court had unreasonably applied the rule of Jackson v. Virginia, 443 U.S. 307 (1979) (that a jury find each element of the crime of depraved indifference murder beyond a reasonable doubt.).

the court was unable to find that "the evidence was *so* completely lacking that *no* rational jury" could have found the defendant guilty of depraved indifference murder.  664 F.3d at 22-23 (citing <u>Cavazos</u>, 132 S.Ct. at 4–5).   Applying the heightened deference standard of <u>Cavazos</u> and <u>Renico</u>, the Second Circuit found that they had "no choice but to uphold the decision of the state court."  665 F.3d at 22.  With this heightened deference in mind, this Court evaluates Lopez's claim of ineffective assistance of counsel.

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD UNDER *STRICKLAND*

Under the AEDPA standard of review, the Court must determine whether the state court reasonably applied the Supreme Court's standard for analyzing ineffective assistance of counsel, as set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  This determination is to be made based on the facts on record in the state court proceeding.  The <u>Strickland</u> standard does not grade counsel's performance, and is not intended "to improve the quality of legal representation . . . [but] simply to ensure that criminal defendants receive a fair trial."  466 U.S. at 689.  In applying <u>Strickland</u>, the reviewing Court must resist the temptation to second-guess trial counsel's decisions.

Under <u>Strickland</u>, to show ineffective assistance of counsel, petitioner must: (1) show that his counsel's performance fell below an objective standard of reasonableness; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation.  The Court has stressed that the <u>Strickland</u> standard is "rigorous" and difficult to overcome, and that courts should refrain from using hindsight to reconstruct counsel's challenged conduct.  <u>Bell v. Miller</u>, 500 F.3d 149, 155 (2d Cir. 2007) (citing <u>Strickland</u>, 466 U.S. at 689)); <u>see</u> <u>also</u> <u>Padilla v. Kentucky</u>, 130 S.Ct. 1473, 1485 (2010); ("Surmounting <u>Strickland</u>'s high bar is never an easy

25

task.").  Recognizing the difficulty of overcoming this standard, the Second Circuit has held that

the defendant faces a "heavy burden" in establishing ineffective assistance.  Eze v. Sendkowski,

321 F.3d 110, 112 (2d Cir. 2003).  Just as the AEDPA mandates deference to state court

decisions, ineffective assistance jurisprudence is intended to similarly provide deference to

counsel's judgment during prior state court proceedings.  Courts must maintain a "strong

presumption that counsel's conduct falls within the wide range of reasonable professional

assistance . . . the defendant must overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.'"  Strickland, 446 U.S. at 689 (citing

Michel v. Louisiana., 350 U.S. 91, 101 (1955)).  The "objective standard of reasonableness" is

measured under "prevailing professional norms."  Id. at 688.

Even if trial counsel's representation falls into the narrow range of professional assistance

that is below an "objective standard of reasonableness," the petitioner must still demonstrate that

ineffective assistance caused him prejudice.  Absent a showing of prejudice, a claim of

ineffective assistance cannot succeed.  Unless the defendant proves both of these elements—

deficient performance and prejudice—a court cannot find that the sentence or conviction

"resulted from a breakdown in the adversary process that rendered the result of the proceeding

unreliable."  Id. at 687.  In order to demonstrate prejudice, Petitioner "must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different."  Id. at 669.  A "reasonable probability" is defined as "a probability

sufficient to undermine confidence in the outcome."  Id.

The Supreme Court has classified federal courts' habeas reviews of ineffective assistance

of counsel claims as "doubly deferential," requiring the reviewing court to assess both the

reasonableness of trial counsel's legal strategies during trial, as well as the reasonableness of the state appellate court's evaluation of counsel's strategy.  See Yarborough v. Gentry, 540 U.S. 1, 6 (2003) ("Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas.").

In order to justify habeas relief, Lopez must prove that the New York court unreasonably applied the Strickland standard for ineffective assistance of counsel.  Petitioner must show that the First Department "applied Strickland to the facts of his case in an objectively unreasonable manner."  Bell v. Cone, 535 U.S. 685, 698-99 (2002).  Since the standard in Strickland is a "general standard," the State court "has even more latitude to reasonably determine that a defendant has not satisfied that standard."  Mirzayance, 556 U.S. at 112.  In analyzing whether or not a state court's application of a rule was "unreasonable," the level of specificity of the rule needs to be taken into consideration.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").  Given the generality of the Strickland standard, a federal court assessing a habeas petition must take into consideration the fact that the State court has significant leeway in reaching outcomes on ineffective assistance of counsel cases.  Id. at 664.

As previously noted (See footnote 1, supra), EED is an affirmative defense, the elements of which defendant must establish by a preponderance of evidence; and if successful, the defense does not result in an acquittal of the murder charge, but rather in a manslaughter conviction.  By way of contrast, justification is not an affirmative defense, and the Government must establish beyond a reasonable doubt, that the killing was not in self defense.  The Government's failure to prove that the killing was not justified, results in an acquittal.

27

The trial record reflects the defendant's tumultuous life history with his common law wife, including frequent physical attacks on one another. Protective orders were sought and issued. There was certainly a valid basis for arguing that defendant acted in self defense; and his conduct was justified. At the same time, the EED argument was not a compelling one. Immediately after the killing, Lopez was calm and composed enough to ask a neighbor to call the police. Further, when Lopez returned to his apartment, he left the door open so the police could peacefully enter. He was quietly cooperative with the police, and his calm deportment on the videotaped confession suggest separately and in combination, that he was not extremely emotionally disturbed immediately following the killing. The EED defense may have been a weak one—and in conflict with the chief defense of justification. Further, trial counsel fully participated in the trial and convinced the trial court judge to include a charge on the lesser included offense of manslaughter in the first degree. All of this (and more) was on the record before the Appellate Division—and support its conclusion that counsel was not ineffective.

The question before the Court is not whether the extreme emotional disturbance defense could have been raised at trial, but rather, did the Appellate Division unreasonably apply the Strickland standard.[14] The Appellate Division's application of Strickland in analyzing and concluding that counsel was not ineffective was reasonable, and Lopez's habeas petition must be denied.

---

[14] While a defense of EED is not necessarily incompatible with a justification defense, and one could suggest there is no downside to lumping the two together, the Supreme Court has never held that "nothing to lose" is a part of the ineffective assistance of counsel claim Carrion v. Smith, 644 F.Supp.2d 452, 464 (S.D.N.Y. 2009). See Mirzayance, 556 U.S. at 122 (holding that "[the Supreme Court] has never established anything akin to the . . . 'nothing to lose' standard for evaluating Strickland claims.").

## IV.  TRIAL COUNSEL'S FAILURE TO OBJECT TO JUSTICE NEWMAN'S JURY INSTRUCTION DOES NOT CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL

Lopez asserts that trial counsel was ineffective for failing to object to Justice Newman's jury instruction on self defense.  Specifically, Lopez argues that Justice Newman's instruction regarding whether it was necessary to use force each and every time Lopez stabbed Torres was an inaccurate statement of the law and that the instruction on who was the initial aggressor was over-broad and effectively took the issue of justification away from the jury.  Considering that trial counsel based his entire defense on a theory of justification, Lopez contends that trial counsel's failure to object was unjustifiable and deficient.  Lopez also argues that he was prejudiced by trial counsel's failure to object to the erroneous jury instructions.

The Second Circuit has held:

> Counsel's failure to object to a jury instruction (or to request an additional instruction) constitutes unreasonably deficient performance only when the trial court's instruction contained 'clear and previously identified errors.'  Conversely, when a trial court's instruction is legally correct as given, the failure to request an additional instruction does not constitute deficient performance.

Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) (citations omitted).

Lopez argues that Justice Newman's instruction that the jury must find that "'each and every stab wound [was] justified'" was erroneous because even if some of the stab wounds were excessive, the fatal wounds inflicted may still have been justified.  Justice Newman went on to instruct that: "If at some point during the encounter with Miss Torres . . . [Lopez] continued to use deadly force at a time when it was no longer reasonable to believe that the use of deadly force was necessary to defend himself, then [the jury] must conclude that at that point he was no longer [justified]."

29

Justice Newman's instruction was a correct statement of the law.  See e.g., Davis v. Strack, 270 F.3d 111, 125 (2d Cir. 2001) (Under New York law "[i]f the defendant reasonably believes . . . that it is necessary for him to use deadly physical force to defend himself, then the defendant is justified in using deadly physical force against the other person, but only to the extent he reasonably believes necessary to defend himself.") (interpreting NY cases).

Lopez also argues that trial counsel was deficient for failing to object to Justice Newman's instruction on how to determine whether Lopez or Torres was the initial aggressor. Specifically, Lopez argues that the instruction that the People need only prove that he was the initial aggressor as to the encounter in the living room was unduly narrow, and effectively took the issue of justification away from the jury because it did not permit them to consider the events preceding the encounter in the living room.  The First Department conceded that "the court should have provided a broader instruction to the jury with regard to its determination of whether defendant or the victim was the initial aggressor," but nevertheless held that the error was harmless.  People v. Lopez, 36 A.D.3d 431, 432 (1st Dep't 2007), appeal denied, 8 N.Y.3d 947, 836 N.Y.S.2d 557 (2007).  This Court agrees with the First Department and adopts Magistrate Judge Peck's recommendation that the error, if any, was harmless (i.e., in Strickland terms did not prejudice Lopez) in the context of the justification defense, and that, taken as a whole, the state court's jury instruction accurately reflects the law.  Accordingly, the Court adopts the R&R insofar as it denies habeas corpus based on the failure to object to the justification charge.

## V.   **CONCLUSION**

For the foregoing reasons, the Court denies Lopez's petition for a writ of habeas corpus. In view of the Magistrate Judge's Report and Recommendation, however, the Court issues a certificate of appealability, confined to the issue of whether counsel was ineffective for failure to

utilize a defense of extreme emotional disturbance.  (28 U.S.C. § 2253(c)).  The Clerk of the

Court is directed to enter judgment and terminate this case.

Dated:  New York, New York
        January 27, 2014

SO ORDERED

PAUL A. CROTTY
United States District Judge

31